CHARLES D. W. JOHNSON *vs.* JOHN CLENDENIN AND SAMUEL WAY.—*December*, 1833.

The object and design of the writ of *ne exeat regno*, as used by courts of chancery, is to hold the party amenable to justice, and to render him personally responsible for the performance of their orders and decrees.

The obligations devolved upon sureties entering into a bond conditioned to obey such a writ, bear a close resemblance to the duties and responsibilities of bail at common law; they undertake that the defendant shall be personally responsible for the performance of the orders and decrees of the court.

Where the defendant in the writ of *ne exeat* has been proceeded against and committed to jail for not complying with a final decree of the court in the cause, and afterwards escapes from custody, his securities upon the *ne exeat* bond are not responsible, and the court as respects them may order the bond to be cancelled.

APPEAL from the equity side of *Harford* county court.

The appellees on the 17th August, 1829, became sureties for a certain *Nathan Walton*, in a *ne exeat* bond in the penalty of $6000, conditioned, "that the said *Walton* shall not go, or attempt to go, or depart from the State of *Maryland*, without the leave of the *Harford* county court, for that purpose obtained."

A final decree was subsequently made in the cause, in which the *ne exeat* issued, ordering *Walton* to bring into court the sum of $5540; upon the bringing in of which sum, the decree directed that the writ of *ne exeat* aforesaid be dissolved.

This decree not being complied with, an attachment issued at the instance of the appellant, (who was the complainant in the case against *Walton*,) to compel the performance of the decree. Upon this attachment *Walton* was taken and duly committed to prison, from which he effected his escape. Afterwards, upon the application of the complainant, a writ of *sequestration* issued, under which the property and effects of *Walton* were taken. In this state of the case, the appellants filed their petition, praying that the *ne exeat* bond might be cancelled as to them; and an order

to that effect having been passed by ARCHER, Ch. J., the appellant brought the record by appeal to this court.

The case was submitted on written arguments to BUCHANAN, Ch. J., and MARTIN, STEPHEN, and DORSEY, J.

*Otho Scott* for the appellant.

The appellant contends, that the committing of *Walton* under the attachment to bring the money into court, did not *per se* discharge the sureties in the *ne exeat* bond, and that although the court, upon application, might have discharged them while *Walton* was in custody, it could not be done after he had escaped from prison. The order of the court in this case directs, that the *ne exeat* be discharged upon the bringing in of the money, which implies, that it is not discharged till that is done. The being in custody for the contempt in not obeying the order is not equivalent to complying with it. The imprisonment of the party is no satisfaction of the order. Even while he remains in custody a sequestration will issue, which could not issue if the imprisonment was regarded as satisfaction. See *Hind's Ch. Pr.* 129, citing 1 *Ch. Rep.* 152. Nor is the being in custody on a *ca sa.* if the party escapes, considered as satisfaction of the judgment. *Ford, terretenant of Preston vs. Gwinn's Admr.* 3 *Harr. and Johns.* 496.

The condition of the bond is, that the party *shall not depart from the State without the leave of the court.* He has left the State, and without the leave of the court, has broken the condition, and given the plaintiff a right of action against his sureties before any application was made to be discharged.

There are two authorities where the court refused to discharge the sureties upon application, where the defendant was in actual custody under process in the suit. See *Le Clea vs. Trot. Prec. in Ch.* 230, and *Stapylton vs. Peill,* 19 *Ves.* 615.

In *Debazin vs. Debazin*, 1 *Dick.* 95, a similar application was granted. It would seem that this case was overruled by the case in *Vesey*. But suppose it is not, it is very distinguishable from the case under consideration at the time of the application; in that case the party was in actual custody, and had not left the kingdom; in this case the party is not in custody, but has departed from the State. The court might reasonably discharge the sureties, when their principal was in custody under their process, when they would not do so, if he had escaped and fled from the State.

There is no analogy between sureties in a *ne exeat* bond, such as is given in this case, and special bail. The latter are considered technically the jailors of their principal, and may arrest him at any time and surrender him. The condition of their undertaking is complied with, if the *principal renders himself upon a ca sa.* There is no such condition in the *ne exeat* bond, it is, *he shall not depart, &c.*

The form of the condition has some influence, as will be seen by reference to the different relations in which bail to the sheriff stand to their principal, to that of special bail. The condition of bail to the sheriff is, that the principal shall appear.

Bail to the sheriff cannot surrender their principal, and if he is even imprisoned it does not discharge the bail. *Hamilton vs. Wilson*, 1 *East.* 390. 1 *Tidd's Pr.* 252.

The proceedings against *Walton's* property after his escape could not release his sureties, no injury was done to them by it; on the contrary they were benefitted, as all that could be made out of the property would go to diminish their responsibility on the amount of it.

It is doubtful, whether for the escape an action could be maintained against the sheriff. It is not a committal upon final execution, and so a constructive satisfaction as regards the principal debtor, if he had not escaped.

*Constable*, for the appellees.

The inquiry is, whether the court below erred in ordering the *ne exeat* bond to be cancelled, *as to the appellees who signed it as sureties*. This will depend upon the true character and extent of liability incurred by sureties in a *ne exeat* bond; and as preliminary to the consideration of that question, we will briefly examine the *objects* of the writ of *ne exeat*, and the *purposes* for which the bond is required.

The writ of *ne exeat regno* has always been regarded in *England* as part of the royal prerogative intended for political purposes, but the principles on which its exercise by the *British* government has been defended, are unsuited *to* the enjoyment of rational freedom, and ought *to* be repudiated as odious dogmas, destructive of *the* unquestionable national right of every man to seek happiness, by *bona fide* change of domicil, in whatever country he can find it. In this country, the writ of *ne exeat* is a "writ of right," and was so held in *Gibert vs. Colt*, 1 *Hopkins*, 500. And in *England*, it is now universally considered as a remedial process of the civil law, to which the suitor is entitled, upon presenting a case within the settled principles governing that branch of chancery jurisdiction. *Beames' Ne Exeat*, 21. 1 *Vesey and Bea.* 129. Sir *Samuel Romilly* arguendo, 19 *Vesey*, 312. In the case of *Porter vs. Spencer*, 2 *J. C. R.* 172, Chancellor *Kent* remarks, that "he has no discretion or option to refuse the writ, when a case is brought within the established rules of the court.

The former rules which prevailed on this subject, that a debt to authorize the issuing of this writ, must be purely equitable, for the recovery of which no action could be maintained in a court of law, *Bea. Ne Exeat*, 29, 33, and that the affidavit must state positively the precise sum due, *Ib.* 32, have been modified, and changed by the course of modern decisions; and it is now well settled, that if the party has not made his election, by instituting proceedings in a court of law, this writ may properly issue

upon an affidavit stating the plaintiff's belief as to a balance due him, and whether the subject matter be of a character over which the court of chancery exercises an *exclusive* or *concurrent* jurisdiction. 8 *Vesey,* 593, 8. 11 *Ib.* 55. 15 *Ib.* 444. 16 *Ib.* 470. 1 *J. C. R.* 1. 2 *Ib.* 169. 6 *Ib.* 138. 7 *Ib.* 189. And the better opinion seems to be, that the writ may issue though the demand be not liquidated. *Denton vs. Denton,* 1 *J. C. R.* 364. In the case of the *Attorney General vs. Mucklow,* 1 *Price's Exc. Rep.* 289. The court of exchequer, conformable to their practice of making orders in the nature of the writ of *ne exeat,* passed an order directing the sum in which security should be given, although no amount was stated in the affidavit. And the *American* annotator, upon *Beames' Treatise* on the writ of *ne exeat,* 32, remarks, that "the good sense and equity which guided these decisions, are believed to be worthy of general application."

From recurring to the general principles which govern the court of chancery in granting the writ of *ne exeat,* it is obvious that the proceeding is analogous to the taking of bail at law. I shall therefore attempt to maintain, that the process of *ne exeat* issues for the purpose of compelling the party to give "equitable bail." And that the bond exacted by the sheriff in executing the writ, is in the nature of a *bail bond.*

In support of this position, I shall not rely on any isolated adjudication, but refer to the uniform language and opinions held upon the subject by the most eminent *English* chancellors. In *Exparte Brunker,* 3 *Pere W.* 312. Ld. Talbot, in discharging a writ of *ne exeat,* upon the ground that the defendant had been arrested at law, remarks, that the plaintiff "*ought not to have double bail.*" In *Russell vs. Asby,* 5 *Ves.* 97. *Ld. Rosslyn* says, " upon application for this writ no *subpœna* is taken out, but upon personal service of the writ, the defendant is bound to appear. He must come into court and appear, for he is to *give bail.*" In *Jones vs. Sampson,* 8 *Ves.* 593, the defendant had been arrested at

law, and *Ld. Eldon* said, he must "impose terms upon the defendant, that the bail at law should stand, or he should come under a writ of *ne exeat.*" And in the case of *Amsinck vs. Barklay, Ib.* 594, 7, *Ld. Eldon,* after mentioning the opinion of *Ld. King,* that if the party has bail, he shall not have this writ, said, that as the defendant had been twice held to bail at law, the writ must be discharged; and the decision is based on the rule of law, that a person shall not be arrested, and held to bail a second time upon the same cause of action, and although the plaintiff urged that the suits had been discontinued for the want of jurisdiction, still the chancellor said, "you cannot after an arrest at law, make the defendant give *equitable bail.*" In *Jackson vs. Petrie,* 10 *Ves.* 164, *Ld. Eldon* said, "the affidavit must be as positive as to the equitable debt, as an affidavit of a legal debt *to hold to bail.* In *Haffey vs. Haffey,* 14 *Ves.* 261, *Ld. Eldon* said, "this writ has been considered in the nature of *equitable bail,* and under circumstances that would not entitle you *to bail at law,* you cannot have this writ here." In *Jones vs. Alephsin,* 16 *Ves.* 470. *Ld. Eldon* said, "if it is settled, that though the plaintiff swearing to the balance of an account, may have *bail at law,* yet this court holding a concurrent jurisdiction upon the head of accounts, he may have the writ." In *Dick vs. Swinton,* 1 *Ves. and Beame,* 372. *Ld. Eldon* said, " this court has made use of this great prerogative writ, for the purpose of holding a man to what is called *equitable bail,*" and in ordering the writ to issue, remarks, " this writ has been modelled upon the view which the court has taken upon the answer as to the sum for which the defendant ought to be *held to bail.* In *Stuart vs. Graham,* 19 *Ves.* 312. *Ld. Eldon,* in speaking of the case of *Dick vs. Swinton,* says, "that the grounds upon which the writ was discharged in that case were, that the court considering this in the nature of *equitable bail, &c.* and in the same case, *pages* 315, 316, the lord chancellor said, " I admit the hardship that may be the effect of granting this writ, &c. but the case of *bail,*

if this is to be assimilated to that, has all that hardship;" and after taking time to examine as to the sufficiency of the affidavit, it having been made by the committee of a lunatic, he ordered the writ to issue with these remarks. "They hold to bail at law in bankruptcy, on the oath of the assignee, when the bankrupt will not make the affidavit; and I am informed that they have held to *bail at law*, upon the oath of the committee of a lunatic."

In *Raynes vs. Wyse*, 2 *Mer. Ch. Rep.* 472, the writ of *ne* previously arrested at suit of the plaintiff for same debt, and *exeat* was discharged on the ground that the party had been discharged by him. In *Goodman vs. Sayers*, 5 *Mad. Ch. Rep.* 471, the vice chancellor said, "the writ of *ne exeat* is granted in support of a bill filed for an equitable demand, as bail is required at law in support of an action." In *Grant vs. Grant*, 3 *Rus. Ch. Rep.* 598, the lord chancellor, after remarking that the plaintiff cannot sue at law while an injunction is continued, says, from the analogy "he cannot be entitled to the benefit of a writ of *ne exeat* which comes in lieu of an arrest at law, &c."

In *Beame's Treatise* on *Ne Exeat* 43, it is said, "on the ground that this writ is in the nature of equitable bail, the court has, in many instances, shown a desire to preserve a certain analogy between the writ of *ne exeat regno* and bail at law;" and the same general rule is more fully stated in 1 *Hovenden on Frauds*, 131, where it is said that "this writ is now looked upon only as a civil process to hold a party to bail for an equitable debt, under the same circumstances in which, if the debt were a legal one, he might be held to bail at law." Citing the case of *Flack vs. Holm*, 1 *Jac. and Walk.* 416; and the quotation here made from 1 *Hovenden on Frauds*, will be found to be the words of *Ld. Eldon*, by reference to *Jac. and Walk.* In *Spencer vs. Porter*, 2 *J. C. R.* 169, chancellor *Kent* grants the writ, but with an express disclaimer "that it would not be holding the party to bail when it could not be required, nor would it be exacting double bail;" and in *Smedberg vs. Mark's Ex.* 6 *J.*

*C. R.* 138, one of the grounds assigned by the chancellor for refusing the writ of *ne exeat* was, that the bill did not charge that assets had come to the hands of the defendant, and the demand arising in *auter droit* rendered that allegation indispensable, "otherwise it would be holding one to bail who could *not be held to bail at law*. And the cases of *Nixon vs. Richardson,* 4 *Des. Eq. Rep.* 108, and *Rhodes vs. Cousins,* 6 *Randolph,* 188, will be found to establish the same doctrine.

There is no case in which the converse of the position assumed by me has been decided, although there are a *few dicta which intimate,* that there is a distinction between bail at law and sureties in a *ne exeat* bond. The first case to be found is that of *De Carriere vs. De Calonne,* 4 *Ves.* 490, in which the chancellor says, *"the application* for the writ of *ne exeat* stands upon a ground perfectly different from an affidavit in a court of law to hold to bail. That is a process which the party has a right to take upon his own affidavit without an application to the court. But an *application* for the writ of *ne exeat regno* is to the discretionary power of this court.

The only difference between bail at law and this writ, according to this case, consists in the *form* of obtaining them. *"The application* for the writ," says the chanceller, "stands on ground perfectly different"—Bail at law being *obtained* without an application to the discretionary power of the court. But the writ of *ne exeat* issues to hold the party to bail for an equitable demand, and is in its effects precisely similar to taking bail at law, is not denied; the only perceivable distinction being as to the *application* or *mode* of procuring it, and such a difference may be admitted without its affecting the view I have taken, for it equally prevails with regard to every other analogous proceeding of the two courts.

In *Hannay vs. McEntire,* 11 *Ves.* 55, *Ld. Eldon* said, he did not know that he ought to grant the writ merely because a judge at chambers would order bail, and he refers

to the contrariety in the practice of the courts of law in hold-ing to bail. This is a mere annunciation of the *discretion-ary* power of the court of chancery over the application. In *Hyde vs. Whitfield,* 19 *Ves.* 344, *Ld. Eldon* says, "the analogy between this writ and bail at law is not *universal,*" and for the distinction he again refers as in *Hanney vs. Mc-Entire,* to the fact, that "the court of king's bench formerly would not hear a defendant to reduce the amount in which he had been held to bail, but this court always heard a de-fendant attempting to get rid of this writ," and yet in the very same opinion, he says, "here, as at law, where the party *is to be held to bail,* the affidavit must be positive."

In the last case *Ld. Eldon* attempts to rest the distinction upon the fact, that at one time the practice of the court of chancery with regard to discharging the writ, and that of the king's bench as to releasing bail, were wholly different. The latter considering the affidavit decisive, while the for-mer would examine into its merits. It should be recol-lected that the court of common pleas have always inquir-ed into the propriety and amount for which bail should be taken, and even the rule of the king's bench had been changed at the time *Ld. Eldon* made the remark, so as to conform to the practice at *nisi prius,* as is admitted by him in the case of *Stuart vs. Graham,* 19 *Ves.* 315.

But independent of the express words of *Ld. Eldon,* in *Flack vs. Holm,* 1 *Jack. and Walk.* 416, the case of *Am-sinck vs. Barklay,* 8 *Ves.* 594–7, shows how far he has car-ried the analogy. In that case the writ was discharged upon the rule of law that a party could not be held to bail a second time on the same cause of action : and although in *Hyde vs. Whitfield,* he undertakes to deny the analogy, or more properly, "that the analogy is *universal*" between this writ and bail, yet in all the cases he clearly admits that the strength of the analogy controls and determines the fate of the application : for in *Amsinck vs. Barklay,* he re-fuses the writ out of respect for an antiquated rule of law

which modern decisions have not only denied the general application of, but narrowed down to cases of gross laches, or purely vexatious arrests.    Vide 1 *Bacon's Ab*. 329, *title bail, letter B, sec*. 3.

Whether the writ of *ne exeat* be a process to which the party is entitled as matter of right, as was said by *Lord Keeper, Wright, and Sir Samuel Romilly*, and admitted by chancellors *Eldon and Kent*, or depending upon the discretion of the court, and whether it be universally analogous to bail at law or not, cannot vary or destroy the force of my argument.    It is sufficient to sustain my proposition, that the concurrent opinion of the *English* chancery bench has definitively settled, that to warrant its issuing there must be an affidavit of precisely the same character with that which is necessary *to hold to bail at law*. 10 *Ves*. 164.    14 *Ib*. 261. 16 *Ib*. 470.   When it issues, the defendant is to "*give bail*." 5. *Ves*. 97.    1. *Ves. and Bea*. 372.    19. *Ves*. 312, 344.  1 *Jac. and Walk*. 416.    5 *Mad. Ch. Rep*. 471.    That if it was granted after an arrest at law, it would be requiring "*double bail*." 3 *Per. Wm*. 312.    8 *Ves*. 593.    *Ib*. 594-7. 2 *Mer. Ch. Rep*. 472.   That it is attended with the same hardships as bail, 19 *Ves*. 316, and that it will not issue when under similar circumstances bail would not be required at law.    14 *Ves*. 261.    2 *J. C. R*. 169.    6 *Ib*. 138. *Cox vs. Scott*, 5 *Har. and John*. 384.

I maintain that these cases demonstrate beyond successful refutation, the striking and strong analogy between the writ of *ne exeat* and bail at law, and clearly show, that the former is emphatically a mere civil process to obtain equitable bail.    If then it be a proceeding in the nature of bail, and the court of chancery are regulated by that consideration, in ordering it to issue, will they disregard the rules which obtain at law, when a question is presented, involving the right of equitable bail to be released?    If equitable bail are held by analogy to bail at law, are they not entitled to the benefit of the same analogy, when seeking

to be discharged? Unless the analogy prevails to that extent, it is odious and unjust.

Do courts of chancery deal less liberally with their bail, than courts of law? Do they countenance the rigorous and harsh prosecution of a surety, in cases which courts of law would not tolerate? Is the maxim of the court of chancery, that a surety shall be favorably regarded, and his liability never extended or enlarged, to be inverted in this case? If not, and the facts be of such a character as would, were we in a court of law, entitle bail to an *exoneretur*, these appellees ought unquestionably to be discharged.

The decree which was made in this cause, at the March term, 1830, of *Harford* county court, is certainly a final decree, at least it must be so considered as to the defendant, *Walton;* and the attachment undoubtedly issued for the purpose of compelling *Walton* to bring into court the amount directed to be paid by that decree. This proceeding was had under the 25 *sec.* 72 *ch.* of the act of 1785, by which the process of attachment, sequestration, *capias ad satisfaciendum, and fieri facias,* are made concurrent remedies to compel the performance of decrees. Under this attachment the defendant, *Walton,* was taken into custody of the sheriff, and a *committitur granted on motion of the appellant,* and I insist that the service of the attachment, and especially the commitment upon it, operates a discharge of the sureties in the *ne exeat* bond.

The same reason exists here as in the case of an arrest of the principal on *ca sa,* issued upon a judgment at law—the deprivation of the bail of all power over the body of the principal. If then it be true, as it indubitably is, that bail are regarded as their bailee's jailors; *Ex parte Gibbons,* 2 *Atk.* 239;—that they may break and enter a house to take him; 7 *Johns. Rep.* 156;—even the house of a third person; 2 *H. Black.* 120;—may pursue him into a foreign state and seize him on a Sunday; 7 *Johns. Rep.* 155;—may take him while in actual attendance as a witness on a court of justice, and

without fresh process, and employ force if necessary. *Peake's N. P. C.* 226;—may depute this power to another, and in the case of the death of bail it will descend on his executor or administrator.   1 *B. and P.* 62.   7 *Mass. Rep.* 169.   I ask if it be possible, that they can be shorn and stript of all these powers, upon a motion of the plaintiff, and yet be held responsible unless they render the body of their principal? Is not the situation of the bail so essentially changed and their risk so greatly augmented as manifestly to entitle them to an *exoneretur*?   10 *John. Rep.* 595.

But it is maintained on the part of the appellant, that *Walton's* being in custody for the contempt in not obeying the order of the court, was not equivalent to complying with it.   To which we reply, nor is an arrest and *imprisonment* on a *ca sa*, equivalent to paying the judgment, yet it is undoubtedly sufficient to discharge the bail.   It is further urged that the imprisonment cannot be regarded as a satisfaction of the "order," because a sequestration will issue, &c.

We admit, that according to the *English* practice, a writ of sequestration may properly issue while the party is in custody for contempt in not filing an answer, or not obeying any *interlocutory* order.

In this case however, the *attachment* did not issue in consequence of the parties refusal to comply with a *mere order*, nor was the application for it made to the *discretionary* power of the court; on the contrary it was a process resorted to as matter of right, under the provisions of the act of 1785, and indisputably issued *in the nature of an execution*, to coerce the performance of a decree, final to every purpose, so far as *Walter* was interested.

Had it been a mere attachment *for contempt*, issued in conformity with the *English* practice, it would be deemed in the nature of *mesne process*, and the sheriff might have taken bail.   6 *Taunt.* 569.   4 *Dow. and Ry.* 393.   And will it be insisted that the sheriff was at liberty to take bail, upon the service of the attachment which was sued

out in this case. It cannot be pretended, that the sheriff may take bail on an execution. *Cro. Eliz.* 647. *Strange,* 479, and the court of Exchequer in *Philips vs. Barrett,* 4 *Price,* 23, expressly decided, that the sheriff is not authorised to take a bail bond, from a defendant in custody, under an attachment for non payment of costs, *because such a process is in the nature of an execution. Vide Pre. in Chan.* 331, where the same rule is distinctly laid down.

If then this be the legitimate rule, as stated in these auauthorities, and emphatically said by the lord chancellor in the case of *Morrice's Exr. and Widow vs. The Bank of England, Tal. Cas.* 222. "That as judgments at law may be executed by a *capias ad satisfaciendum* to take the person, *so similar to that, are attachments for not performing decrees."* ~We maintain, that independent of the statutory provision by which the process of attachment is afforded, as a concurrent remedy with the *ca sa* and *fi fa,* the *English* practice and decisions explicitly determine such a process as the attachment, which issued in this cause, *to be an execution.*

We concede to the appellants, that a commitment under a *ca sa,* if the party escapes, is no satisfaction of the judgment, nor is a discharge under the insolvent laws, or any temporary exemption by privilege from imprisonment ; but that in such cases the judgment is resuscitated, and the plaintiff re-invested with all his rights under it ; and after an escape may resort to a new execution, or institute an action upon the judgment. 2 *Bac. Ab.* 240. 5 *Peters' Ab.* 40. But that cannot affect this case, for if it be granted, that the commitment under the attachment is so far distinguishable from the taking a party in execution at law, that it cannot be deemed a satisfaction of the decree after the escape, nor even while he continue in execution ; still I contend, that in either case, it must be held to discharge the sureties in the *ne exeat* bond. Are not bail at law exonerated after the party is in custody on a *ca sa,* whether he

continue so, or affect his escape? Will it be pretended, that the escape revives the plaintiff's right against the bail? Had he in fact any right to be resuscitated? The error of the argument, on behalf of the appellant, is ascribable to his placing the bail's release on a wrong ground. The true reason of the bail's discharge, is not that the party has satisfied the judgment by being imprisoned;" but it is, *that the execution divests them of their power over the body of their principal.* 7 *Cowen,* 472. And will it be permitted, that the relation between *Walton* and the appellees shall be so changed, without their agency or assent, as to make them liable, when they contracted in becoming his sureties, upon the faith of the relation being undisturbed, especially by the appellant? Can it be possible, that when that relation is materially changed without fault or laches, imputable to the appellees, or by any act which they could not control; nay, by an act of the very party to whose benefit the suretyship is intended to enure, they are still to be deemed liable? Can a result so obnoxious to every principle of moral right and equity, find its warrant in any adjudicated case?

But the appellant attempts to assimilate this case to that of bail *below,* or to the sheriff; and refers to a case in 1 *East.* 390, to show that they cannot surrender their principal, though he be in prison. Upon this subject, the courts in *England* have been gradually extending the rule in favor of the bail. It was once held, that nothing could discharge the bail *below,* but putting in bail *above.* 5 *Burr.* 2683. But the later cases all show, that if the sheriff accept the render, the bail bond is cancelled. *Stamper vs. Melbourne,* 7 *Term. Rep.* 122. *Sharp vs. Sheriff, Ib.* 226. And the case cited by the appellant's counsel from 1 *East.* is to the same effect. And according to the more recent case of *Lewis vs. Davies,* 5 *Moore's Rep.* 267, it would seem, that this inclination of the courts to favor bail to the sheriff, is continuing to encroach on the former rules; for in that case, it was held that no action could be maintained on the bail bond, the party having surrendered himself to

the jailor, although the under sheriff expressly refused to receive the render. But if it be taken as conceded, that bail to the sheriff cannot render their principal in discharge of themselves, yet the analogy attempted to be sustained between bail to the sheriff, and sureties in a *ne exeat* bond, is wholly untenable on principle. The appellant's counsel adverts to the character of their respective engagements, in support of the analogy. To my apprehension, that clearly shows the wide difference which exists between the cases. What is the stipulation of bail to the sheriff? It is that the party shall appear, &c. The great object of taking bail below, is to compel an appearance at the return of the writ. The bond however, is not exacted for the benefit of the plaintiff, but the protection of the sheriff. The idea that the statute was peremptory on the sheriff, and coerced the transfer, has long been exploded; and hence it is, that the courts have inclined to leave it discretionary with the sheriff, to accept a render or not, as he might deem prudent. It is entirely optional with the sheriff, whether he will assign the bond, and if he offer to do so, the plaintiff may undoubtedly elect whether he will accept it, or rule the sheriff to bring in the body. But are such the characteristics of a *ne exeat* bond? Is it taken for the benefit or protection of the sheriff? May he dispense with it as in ordinary cases of bail? Is its condition that the party shall appear, &c.? Is its object to compel him to appear? or as *Ld. Thurlow* says, in *Atkinson vs. Leonard*, 3 *Bro. Ch. Rep.* 218, to "secure the demand" by compelling he party "to abide the justice of the case." The command of the writ is that he shall take "*bail,*" that the party do not depart the State, &c. Does the sheriff return this writ "*cepi corpus,*" or is he according to the form in *Impey's Sheriff*, 367, to return "that he caused the defendant to appear before him, and that he found bail according to the command of the writ?" Could the sheriff upon a return to the *ne exeat*, as in the case of a return of "*cepi,*" to a writ sued out of the court of law, be laid under

rule, or an attachment issue to compel him, to bring in the body of the defendant.     Is it optional with the sheriff whether he will return the *ne exeat* bond?   Will it be pretended that he can conceal it?   It must therefore be *obvious*, that there is not the slightest similitude between the case of bail to the sheriff and sureties in a *ne exeat* bond.     The application of the appellees to have the bond as to them cancelled, might be made at any time subsequent to the commitment on the attachment, which we insist *per se* operated their discharge.   It has been repeatedly settled, that it is not necessary to enter an *exoneretur* on the bail bond, and in the case of *Milner and another vs. Green*, 2 *Johns. Cas.* 283, the motion for an *exoneretur* was denied on the express ground, that it was not "usual or necessary" to make the entry, as a party's arrest on a *ca sa*, and discharge under a commission of bankruptcy, necessarily discharged the bail.   *Loflyn and another vs. Fowler*, 18 *Johns. Rep.* 335. The case of *Stapylton vs. Peill*, 19 *Ves.* 615, is in many respects distinguishable from this.   The application there, was to surrender the defendant after a commitment for contempt in not filing an answer.   This could not be granted, as the writ issues according to *Beames on Ne Exeat*, 65, "until answer and further order."   The defendant must answer before he can move to have the writ discharged, *Ib.* 66, and *Russell vs. Asby*, 5 *Ves.* 97.   Again, the commitment in that case was under a necessary *interlocutory* order, made in the regular progress of the case, while here, it was under process sued out on a *final decree*, and intended to coerce the performance of that decree.   And I insist, that the writ of *ne exeat* must be held to have discharged all its offices, when it detains the party until other and final process may be resorted to.   If under any aspect in which it may be regarded a contrary doctrine were to prevail, writs of *ne exeat* might accumulate in any given case *ad infinitum*.   But it has been settled, that the court of chancery will not grant a *ne exeat* when they can order other, equal-

ly available, process. *Goodman vs. Sayers, 5 Mad. Ch. Rep.* 471.

The case of *Le Clea vs. Trot, Pre. in Ch.* 230, is denied to be law, and was expressly overruled by the decision of *Ld. Hardwick,* in the case of *Debazin vs. Debazin,* 1 *Dickens,* 95, and which we aver to be an authority strictly in point, and must be regarded as definitively settling the question of liability in this case.

In addition to the fact that this decision of *Ld. Hardwick's* is sustained by all the analogies of law, and by abstract principles of moral justice, I need only remark in the language of a distinguished contemporary, that not one of his decrees was reversed, although he held the office of lord chancellor for upwards of twenty years. There is another view of this case which I desire to present in conclusion.

When the writ of *ne exeat* issues, and bail is given to the sheriff, the uniform practice is to discharge the writ upon the defendant's filing his answer, and tendering a bond to abide and perform the decree, &c. *Beame on Ne Exeat,* 58, 68. 2 *Atk.* 66. 3 *Ib.* 409. *Ambler,* 177. 1 *Ves. and Bea.* 129. 3 *Bro. Ch. Rep.* 218. 3 *Johns. Ch. Rep.* 414.

The condition of such a bond, according to the rules of the court of chancery in this State, per chancellor *Kilty,* in the case of *Cox vs. Scott, 5 Harr. and Johns.* 384, is "that the defendant shall perform the decree, or render his body to the custody of the sheriff, to whom any writ of *attachment* or *ca sa* shall be directed."

I maintain then, that the *ne exeat* bond cannot impose a higher or greater responsibility than the bond to abide and perform the decree, &c. If their respective conditions are to be construed with reference to the objects contemplated by their execution, they must undoubtedly be regarded as indentical—I mean where the *ne exeat* bond has continued in full force until after a final decree in the cause, and which is placing it in the most unfavorable light to the appellees. If this aspect of the case be correct, we have only to look

at the condition of the bond to abide and perform the decree, in order to ascertain the true and legitimate character of the *ne exeat* bond.

In support of this view I shall be permitted to ask what is the object and effect of a bond to abide and perform the decree, &c.? It is, according to the settled practice of the court, to discharge the writ, and by consequence the *ne exeat bond.* The bond to provide and perform the decree, &c., gratifies all the purposes of the writ. In the case of *Atkinson vs. Leonard, 3 Bro. Ch. Rep.* 218, *Lord Thurlow* said, "beyond securing the demand there is no reason for the writ of *ne exeat. It should be used only to compel the party to abide by the justice of the case.*" If then this bond, because it "secures the demand" by coercing the party "to abide the justice of the case," has been invariably held to operate a discharge of the writ of *ne exeat,* will it be pretended that it is a security in any sense less comprehensive or available than the *ne exeat* bond. The bond exacted by the sheriff is a mere assurance of obedience to the writ, while the bond to abide and perform the decree, &c. &c., dissolves the writ itself, and must of necessity supersede all the obligations growing out of it. How is it then that this bond operates the rescission of the *ne exeat* bond, if it be not of equal dignity and co-extensive in its condition. Can it be supposed that the practice of the court, in accepting such a bond as a substitute for the writ and *ne exeat* bond, tends to diminish or impair the creditors security; and when that very bond, according to Lord *Thurlow,* dispenses with the "reason for the writ" by "securing the demand? Will it be affirmed that the court of chancery, in receiving such a bond, contravene a well settled rule of law, that the less shall not extinguish the greater security? It is apparent then, that the *ne exeat* bond is to be placed on the same footing with the bond to abide and perform the decree, &c. And hence, it inevitably follows, that whatever would constitute an available defence for the sureties in the latter,

must enure the release of those in the former. And the very letter of the latter bond was complied with in this case—the defendant, *Walton*, having been regularly committed on an attachment issued to compel the performance of the decree.

STEPHEN, J., delivered the opinion of the court.

This is an appeal from an order of *Harford* county court, acting as a court of equity, by which the bond of the appellees was ordered to be cancelled, so far as related to them, in their capacity of sureties, for a certain *Nathan Walton*, who had been taken under a writ of *ne exeat*, issued against him, in a suit of the appellant against him in said court. By the final decree of the court in the said cause, the defendant, *Walton*, was ordered to bring into court the sum of money therein mentioned, on or before a certain time specified in said decree.

*Walton* having failed to comply with this judicial mandate of the court, process of attachment was issued against him, by virtue of which he was arrested, brought into court, and on the application of the complainant, committed by the order of the court to the custody of the sheriff, to be safely kept till he complied with said decree. While in the custody of the sheriff, he effected his escape from imprisonment, and the question which this case presents for adjudication is, whether the decree of *Harford* county court was correct, according to the principles of equity, in discharging the sureties from their responsibility, under the above circumstances? To determine this question, it is only necessary to consider, what is the object and design of the writ of *ne exeat*, as used by courts of chancery in the exercise of their equity jurisdiction. It is to hold the party amenable to justice, and to render him personally responsible for the performance of their orders and decrees. The obligations devolved upon the sureties entering into the bond, bear a close resemblance to the duties and responsibilities

of bail, at common law.   The bail assume upon themselves the obligation, that their principal shall pay the debt, or be personally amenable to the final process of the court; and the sureties in the *ne exeat* bond undertake, that the defendant shall be personally responsible for the performance of the orders and decrees of the court.   To this extent they become answerable, and when this duty has been fulfilled, their engagements, under their bond, are at an end.

That this is a correct view of their responsibility, appears from the following case, in 1 *Dickins*, 95, which is so strikingly similar in all its features, to the present case, that we think it proper to incorporate the whole of it into this opinion.   The case was as follows.   "The plaintiff having sued out a writ of *ne exeat regno*, against the defendant, he entered into a bond with two sureties, for his not departing the kingdom.   The cause was afterwards heard, and there was a decree against the defendant for the same matter, for which the writ of *ne exeat* issued.   The defendant being in contempt, and in custody for not performing the decree, the sureties applied, and obtained an order, that they should be discharged, and the bond, as to them, cancelled."

It is true that in the case referred to, the defendant was in custody for not performing the decree at the time the sureties obtained the order, that they should be discharged, and their bond cancelled, but the principle of the decision shows in the clearest light, the extent of their liability, and establishes beyond controversy, that so soon as the defendant is in custody under the final decree, their bond has performed its office, and their responsibility under it is at an end.   If such be the legal effect and operation of the commitment of the defendant to the custody of the sheriff, for a contempt in not performing the decree, it is conceived that his sureties are not responsible for his subsequent escape from the sheriff, who is an officer of the law, and whose duty it was to keep him in confinement.

We therefore think, that the decision of the court in this case was correct, and that the order appealed from ought to be affirmed.

ORDER AFFIRMED.